**SCHLEIER LAW OFFICES, P.C.**
3101 N. Central Avenue
Suite 1090
Phoenix, Arizona 85012
Telephone: (602) 277-0157
Facsimile: (602) 230-9250

TOD F. SCHLEIER, ESQ.  #004612
Email: tod@schleierlaw.com
BRADLEY H. SCHLEIER, ESQ.  #011696
Email: brad@schleierlaw.com

Attorneys for Plaintiff Robert Mock

IN THE UNITED STATES DISTRICT COURT

IN THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Mock, a married person,<br><br>Plaintiff,<br><br>v.<br><br>GlaxoSmithKline, LLC, a Delaware corporation and subsidiary of GlaxoSmithKline, PLC,<br><br>Defendants | Case No.:<br><br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

Plaintiff Robert Mock, for his Complaint against Defendant GlaxoSmithKline, LLC ("GSK") alleges as follows:

**JURISDICTION AND VENUE**

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 as this matter involves a federal question. This action is authorized and instituted pursuant to the Americans with Disabilities Act ("ADA") of 1990, 42 U.S.C. §§ 12101, *et. seq.*

2. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the District of Arizona.

3. Plaintiff requests a jury trial.

## THE PARTIES

4. Plaintiff Robert Mock ("Plaintiff Mock") is a married man and currently resides in Maricopa County, Arizona. Plaintiff Mock is a disabled person as defined by the ADA.

5. Defendant GSK hired Plaintiff Mock on January 28, 1988 and since 2003, Plaintiff Mock held the positon of Federal Health Systems Account Manager up through his termination on October 6, 2014. During all relevant times, Plaintiff Mock worked for Defendant out of his home in Maricopa County, Arizona.

6. Defendant GlaxoSmithKline, LLC ("GSK") is a Delaware corporation and a subsidiary of GlaxoSmithKline, PLC, doing business in Maricopa County, State of Arizona. At all times relevant hereto, Defendant GSK has continuously been an employer engaged in an industry affecting commerce and is a covered employer for purposes of the ADA, 42 U.S.C. § 12111(5).

## STATEMENT OF CLAIM

7. Throughout his twenty-seven (27) years of employment with GSK, Plaintiff Mock demonstrated exemplary performance and received numerous awards including the "Presidents Club," Winners Circle on many occasions, multiple Sales Awards, Spirit Awards, and Achievement Awards, was consistently a top performer, and was ranked as one of GSK's top account managers.

8. Mock was one of the six Account Managers responsible for managing GSK's Federal Health System and primary point of contact for managing three Federal entities made up of 1) Veteran's Integrated Service Networks (VISNs) – 21 VA regions; 2) Department of

Defense (DOD) C-Suite branches of service: Army, Navy, and Air Force; and 3) Indian Health Services C – Suite customers.

9. Mock's managing duties for these accounts involved meetings, negotiating and implementing product contracts providing GSK's pharmaceuticals and vaccine products, and also worked with the all divisions of GSK's internal salesforces for Mock's twelve (12) State geography to coordinate efforts with Federal contracted Products, pull-through with the TRICARE health plan, and other initiatives. Mock also spent time on conference calls, attending stakeholder meetings, putting together business plans, and creating goal achievement plans.

10. During the last five years of his employment, due the "Patient First" enactment, Mock did travel as part of his work duties to cover his twelve (12) States to meet with both internal and external customers.

11. Under the "Patient First" Enactment, Mock was required to maintain his many different product and disease state annual certifications. Additionally, he was constantly preparing for simulations and assessments on many different products every 2-3 months using Web–cam videos, Training and learning modules which consumed most of his work time. This again was a mandatory requirement in order to stay employed and receive any type of Bonus check.

12. On about May 30, 2012, Mock was diagnosed with two types of cancer, Papillary Carcinoma of the Thyroid and Squamous Cell Carcinoma Stage 3D Throat cancer and he underwent Thyroidectomy, Tonsillectomy and radical throat surgery, insertion of GI Feeding tube and a port in his chest in order to receive his Chemotherapy. Prior to his diagnosis, surgery, and treatment, Mock at 6'1", weighed 184 pounds. Within approximately three to four months, Mock lost 50 pounds and weighed only 134 Lbs.

13. Mock went on Short Term Disability ("STD") time off work from May 30, 2012 to December 3, 2012 and underwent chemotherapy and radiation treatments from July 5, 2012 through September 2012.

14. On about November 30, 2012, GSK approved oncologist Jeffrey D. Isaacs, M.D., prescribed work accommodations for when Mock returned to work on December 3, 2012, restricting Mock from all flight travels due to Mock's high susceptibility of contracting infections and exposure to other people's illness in the airplane's close cabin quarters, and reducing stressors by postponing product assessment testing and allowing Mock to work remotely from home to accommodate essential doctor appointments at this critical recovery stage.

15. Mock completed his treatment for throat cancer and continued to work with a nutritionist and a speech therapist and was determined to rehabilitate his body by working out lightly three days a week for 20-30 minutes

16. Dr. Isaacs believed Mock could return to work in a limited capacity by January 21, 2013 with the continued restrictions of: 1) no flight travels to avoid exposure and risk of contracting others' illness due to low white blood cell count; 2) limiting stressors by postponing testing, on oral simulations and assessments on Products and disease states; 3) working 2-3 hours each morning and afternoon with rest periods; and 4) working remotely from home to accommodate medical treatments and doctor appointments.

17. Throughout his recovery time, Ms. Bonnie Branch (Case Manager) Human Resources frequently called Mock, questioning him about his prognosis and when he was returning to work. Ms. Branch also called Dr. Isaacs office and spoke with Shayna, Dr. Issacs' assistant, demanding to speak to Dr. Isaacs about Mock's health condition. Shayna was upset about the way she was treated on the phone by Ms. Branch. Mock felt pressured

and harassed as GSK was aware of Mock's medical condition and received medical status information from his doctors.

18. In spite of Dr. Isaacs' restrictions, on February 6, 2013 Mock's supervisor, Kim Marburger was also pressuring Mock to complete certain CIA training modules and pressuring Mock over problems Mock was having with a new computer he received upon returning to work.

19. Due to GSK pressuring Mock, Dr. Isaacs updated GSK on March 14, 2013 with Mock's condition and ongoing treatments and reported that although Mock had completed treatment for throat cancer, he still needed additional recovery time and Dr. Isaacs recommended the work restrictions remain unchanged. Mock was still in a vulnerable and frail condition according to his doctors.

20. With these work accommodations, Mock continued to perform his essential functions of his job.

21. However, Mock's health was declining. Mock only weighed 147 pounds, lacked saliva, taste and had difficulty swallowing (Dysphagia) and his insomnia and depression had a substantial negative impact on his daily activities, and was also experiencing ringing in his ears, hearing loss and short term memory loss due to the side effects of chemotherapy and 40 treatments of Radiation.

22. On April 11, 2013, Dr. Isaacs submitted his professional recommendation that Mock go on Short Term Disability effective immediately to focus solely on his recovery and improving his overall emotional and physical health, and also needed to eliminate outside stressors.

23. GSK made it clear to Mock they were not happy about Mock being off work. Bonnie Branch from HR, also pressured Mock to either return to work or go on Long Term

Disability. GSK reluctantly placed Mock on Short Term Disability time off from work from April 15, 2013 to October 24, 2013.

24. Mock's health improved and he continued under a recovery plan with medical care from Dr. Isaacs, as well as a nutritionist, psychologist, endocrinologist, otolaryngologist and gastroenterologist. However, Dr. Isaacs had concerns about Mock's overall health and therefore recommended Mock's work accommodations continue with a no flight travel restriction.

25. GSK pressured Mock about his no flight restrictions and on September 2, 2013 and October 13, 2013 Dr. Isaacs reluctantly modified his travel restrictions from no flights to one flight per month, and continued to recommend work restrictions of at least limiting Mock's extremely stressful product simulation and assessment testing and taking a moderate approach to any make-up work.

26. On October 22, 2013, Dr. Farley Yang, MD, Mock's radiation oncologist, reported Mock's improvements, physically and mentally and to avoid healing setbacks, also recommended work accommodations for Mock's return to work by October 23, 2013, that 1) Mock continue attending his medical appointments; 2) maintain his limited air travel to one flight domestically each month; 3) taking a conservative approach to makeup work assessments, simulations, etc., minimizing undue stress; and 4) integrate short rest periods in his work schedule.

27. With the work accommodations Mock continued to perform the essential functions of his job.

28. On December 12, 2013, Mock emailed his team members including Kara Wilkinson, and copied his supervisor Mr. Kim Marburger, GSK's Regional Director for Medical Center Sales, thanking them for their help in handling some of Mock's customers

while he was on short term disability. Mock's December 12, 2013 email discussed the SCI list and key customers, and expressed how Mock was "excited to be back in the saddle."

29. Mock's team members, except for Kara Wilkinson, responded to Mock's December 12, 2013 email.

30. Upon Mock's return to work, Mr. Kim Marburger also expanded Mock's territory from twelve (12) States, to cover sixteen (16) States, and having Mock also take on key Department of Defense personnel contacts in Texas and Colorado, and VISN 15-19 Pharmacy Executives in Denver and Kansas City.

31. GSK was relentless and continued to pressure Mock to increase his flight travel and by December 16, 2013, Dr. John Milligan, Mock's otolaryngologist, modified Mock's flight restrictions from one flight travel to two round trip flights domestically each month.

32. Mock's health was improving overall.  However, due to continued challenges with swallowing, throat pain, no saliva and trying to gain weight, Dr. Milligan continued Mock's work accommodations to allow Mock to attend all medical appointments, take a moderate approach to makeup work-assessments to avoid setbacks, and continue to integrate rest periods in Mock's work schedule.

33. On January 11, 2014, Mock sent another email, again including Kara Wilkinson and Mr. Kim Marburger, asking his team members to get back to him about coordinating schedules. Again, all except Kara Wilkinson responded to Mock's email.

34.  With the agreed upon accommodation, Mock continued to perform the essential functions of his job.

35. Since Mock's return to work, Mock had been told by three co-workers to "watch his back with Kara," as it was well known within the company that Mr. Kim Marburger wanted Kara Wilkinson to be promoted into Mock's job.

36. On February 5, 2014, Mock flew to Chicago for a mandatory meeting for his Federal Division team.

37. Mock flew back from Chicago to Arizona on February 6, 2014 and as feared, Mock became ill the next day. On February 7, 2014, Mock learned from his doctor that he had contracted a virus from the Chicago return flight.

38. During a February 19, 2014 meeting with Mr. Marburger, Mock and Kara Wilkinson, Mr. Marburger took away an account from Mock and re-assigned it to Kara Wilkinson with no prior discussion with Mock of the re-assignment or of any customer issues.

39. On February 26, 2014, Mock informed Mr. Peter Benson (oncology representative) of the reassignment change and that Kara Wilkinson would now be handling the VISN 19 headquarters account instead of my client.

40. By February 27, 2014, GSK had approved Mock's work accommodations up through March 19, 2014, which allowed Mock to continue attending his medical appointments using Personal Time Off or vacation time, limiting air travel to two round trip flights domestically per month, taking a moderate approach to makeup work assessments, simulations, etc., and integrating short rest periods in his work schedule as necessary.

41. The next day on February 28, 2014, Mr. Marburger called Mock asserting that Kara Wilkinson had informed Mr. Marburger that Mock was not reaching out to her and not working with her. Mock reminded Mr. Marburger that he had sent numerous emails to his team, including Ms. Wilkinson and Mr. Marburger had been copied, and that Ms. Wilkinson was not responding to Mock's emails. Mock explained he was under the impression there was nothing Ms. Wilkinson needed from Mr. Mock.

42. Also during the February 28, 2014 conversation with Mr. Marburger, Mock further satisfactorily addressed the issues raised in Mr. Marburger's February 24, 2014 email,

pointing out certain information Mr. Marburger had not been not fully aware of which supported Mock's updated information provided in his previous email to his team members.

43. Mr. Marburger's continued pattern of being overly critical of Mock made him feel he was not doing his job properly when Mock had been performing his job, and was merely continuing to do what he had done for years at GSK without incident or criticism. In fact, Mock was consistently praised for his strong customer relationships and knowledge of the business.

44. GSK also continued to pressure Mock to increase his flight travels. Mock saw Dr. Isaacs on March 25, 2014 who did not approve of GSK changing Mock's job accommodations and was concerned that the increased workload would prevent Mock from fully recovering.

45. Dr. Isaacs continued to be very concerned about reducing Mock's work stress levels to prevent reoccurrence or relapse of his medical condition and was also concerned with Mock's mental health. Ms. Cathy Payne, ACNP-BC who worked directly with Dr. Isaacs, recommended Mock go on Short Term Disability from April 3, 2014 to October 6, 2014.

46. In early April 2014, Mr. Marburger along with Ms. Dena Pike, GSK's Federal Vice President, rejected Mock's approved work accommodations limiting his flights, and told Mock that he's job required three to four (3-4) flight travels a month, and threatened Mock with losing his job unless his doctor signed-off on Mock doing the 3-4 flights a month, or Mock's job would no longer be available to him.

47. GSK was unwilling to continue to accommodate Mock's illness and his work restrictions even though Mock had been able to handle his job with the accommodated work restrictions.

48. Subsequently, Mock also spoke with Bonnie Branch from HR and asked Ms. Branch about the possibility of getting a voluntary severance package. It was well known within the company that GSK was undergoing a reorganization and making cutbacks.

49. Ms. Branch met with the company lawyers and her superiors about Mock's request and reported to Mock that because his job was "still titled", meaning Mock was still employed and his job was not dissolved, that a voluntary severance package could not be offered to Mock.

50. At no time was Mock offered any other job opportunities within the company with lesser demands than his current positon that Mock was qualified to perform. Mock later learned of at least two positons he was qualified for: Vaccine Contract Manager, Level 6, covering Arizona, Utah, Nevada, Montana, Idaho which was posted available as of January – March 2014; and Immunization Specialist in Tucson which was posted and available as of April – May 2014.

51. The effects of GSK's added workload, continued pressure to increase his flight travels, overall stressful relationship with his supervisor relative to Ms. Wilkinson and concern about Ms. Wilkinson taking his job as well as GSK no longer accommodating his illness and work restrictions, all attributed in Mock's health deteriorating.

52. By June 26, 2014, Dr. John Milligan, also identified Mock with continuing physical limitations/impairments with dry mouth and Dysphagia.

53. By August 19, 2014, Ms. Gerrie L. Jakobs, Mock's licensed oncology social worker, reported that "Robert's medical condition has caused anxiety and a mood disorder. His work is extremely stressful and is not conducive to his healing or to his mental health issues." Ms. Jakobs' prognosis was that Mock was "unable to return to his prior stressful work environment."

54. With his illness and reasonable work accommodations Mock was performing his job duties.

55. Without the continued reasonable work accommodations and due to his illness, Mock was no longer able to perform his job.

56. GSK was unwilling to continue to accommodate Mock's illness and unwilling to engage in the discussions with Mock to identify and implement appropriate reasonable accommodations, and at no time discussed other employment opportunities within the company that Mock was qualified for, even though there were numerous opportunities in his regions for which he was qualified and even over qualified for that would have easily met his necessary accommodations

57. As a result of GSKs refusal to continue to accommodate his illness, its claim that travel was a material requirement of his job, and pressure from GSK to have Mock file for Long Term Disability, Mock was forced to submit his Long Term Disability claim form on August 19, 2014 since his doctors would not allow him to work in his position without the appropriate accommodations.

58. Bonnie Branch, HR was leaving GSK and on August 27, 2014, she sent an email to Mock notifying him that Tamara Hooper would be assigned to handling his short term disability case.

59. Mock spoke with Ms. Hooper and her advice to Mock at that time was to just get a doctor's letter saying he can do that job, and if he can't then just go on long term disability, and if it's denied he can just appeal it.

60. Ms. Hooper made no effort to accommodate Mock's disability or reassign him to another positon even though GSK was aware of Mock's job needs.

61. Mock's Short Term Disability time off work ended on October 6, 2014.

62. GSK immediately terminated Mock's employment also on October 6, 2014.

63. At the time of Plaintiff Mock's termination, GSK failed to engage in the interactive process to determine if Plaintiff could return to work with a reasonable accommodation, even though Plaintiff was able to and had performed the essential functions of his positions with a reasonable accommodation.

64. Additionally, GSK made no effort to reassign Mock to a position where his condition could be accommodated without travel or limited travel even though GSK was aware that after twenty-seven years of employment, Mock was qualified to do many other types of jobs within the company.

65. Upon information and belief, GSK made a decision that it was unwilling to continue to accommodate Mock's illness and his work restrictions, even though it had accommodated Mock's work schedule for two years.

66. Mock could have also continued to perform his job with minimal flight travels as he had the prior two years with the agreed upon reasonable accommodation.

## COUNT I

## **VIOLATION OF THE ADA**

67. Plaintiff hereby incorporates all prior paragraphs as if fully alleged herein.

68. Plaintiff was a disabled person within the meaning of the ADA.

69. Plaintiff was terminated because of Plaintiff's disability and/or Defendant's belief, or perception that Plaintiff suffered from a disability; and/or that his disability or perceived condition would require further time off from work and further expense for Defendant.

70. Plaintiff was terminated by Defendant even though he could successfully perform his job duties with a reasonable accommodation as had been previously provided. Defendant also failed to engage in the interactive process to determine if Plaintiff could return to work with a reasonable accommodation prior to terminating his employment.

71. Defendant terminated Plaintiff in furtherance of a discriminatory practice or policy that tends to target those with disabilities or those perceived as being disabled.

72. Plaintiff's termination violated the Americans With Disabilities Act, 42 U.S.C. § 12101 *et. seq.*

73. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained and continues to sustain damages in the form of lost wages and value of benefits.

74. As a direct and proximate result of Defendant's conduct, Plaintiff has sustained damages in the form of emotional distress, embarrassment, humiliation, and loss of self-esteem.

75. Defendant's conduct is willful and is a dereliction of Plaintiff's federally protected rights, thereby entitling Plaintiff to punitive damages.

WHEREFORE, Plaintiff requests that the Court enter Judgment against Defendant as follows:

1. Special damages to be proven at trial;

2. General and compensatory damages to be proven at trial up to the statutory limits, including but not limited to emotional distress damage, humiliation, embarrassment, and/or loss of self-esteem;

3. Punitive or exemplary damages up to the statutory limits;

4. Attorney's fees;

5. Costs of suit; and

6. For such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

DATED this 17<u>th</u> day of November, 2015.

          SCHLEIER LAW OFFICES, P.C.

          <u>/s/ Bradley H. Schleier</u>
          Bradley H. Schleier
          3101 North Central Avenue, Suite 1090
          Phoenix, Arizona 85012
          Attorney for Plaintiff Robert Mock